# Court of Appeals
## Tenth Appellate District of Texas

10-26-00078-CV

In the Interest of K.K., a Child

On appeal from the
474th District Court of McLennan County, Texas
Judge Nikki Mundkowsky, presiding
Trial Court Cause No. 2024-3508-6

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

**MEMORANDUM OPINION**

Following a bench trial, the parental rights of D.K. (Father) and F.K. (Mother) to the child, K.K., were terminated. The trial court found by clear and convincing evidence that Father had violated Family Code subsection 161.001(b)(1)(D), (E), and (N), Mother had violated Family Code subsection 161.001(b)(1)(D) and (E), and termination was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b). Father and Mother appealed. We will affirm.

## A. Mother's Appeal

Mother raises three issues in her brief. Specifically, she contends that the evidence is insufficient to support (1) the trial court's best-interest finding under Section 161.001(b)(2) where the Department refused to honor an approved kinship placement, (2) the trial court's reasonable-efforts finding under Section 161.001(f) where the Department treats relative-placement attempts as evidence of reasonable efforts and the Department failed to follow through on approved relative placement, and (3) termination under Section 161.001(b)(1)(D) and (E).

### 1. Subsection 161.001(b)(1)(D) and (E)

In her third issue, which we will address first, Mother argues that the evidence is insufficient to support termination under Section 161.001(b)(1)(D) and (E) "under the heightened standard of *In re A.B.*" The termination judgment reflects that Mother's parental rights were terminated based on two predicate grounds: endangering environment (subsection (D)); endangering conduct (subsection (E)). *See* TEX. FAM. CODE ANN. § 161.001(b)(1).

The standards of review for legal and factual sufficiency of the evidence in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency).

In a bench trial, the trial court, as factfinder, is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Family Code, the Department of Family and Protective Services (the Department) must establish by clear and convincing evidence two elements: (1) that the respondent parent committed one or more acts or omissions enumerated under subsection (b)(1), termed a predicate violation, and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *In re J.F.-G.*, 612 S.W.3d 373, 381 (Tex. App.—Waco 2020) (mem. op.), aff'd, 627 S.W.3d 304 (Tex. 2021). Proof of one element does not relieve the petitioner of the burden of proving the other. *J.F.-G.*, 612 S.W.3d at 381.

Termination of parental rights under subsection (D) or (E) requires proof of endangerment, which means to expose the child to loss or injury, or to jeopardize. *Tex. Dep't. of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The endangerment analysis under subsection D focuses on evidence relating to the child's environment to determine if the environment was a source of endangerment to the child's physical or emotional well-being. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). A child

is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *Id.* A parent's conduct in the home can create an environment that endangers the well-being of a child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Termination under subsection (E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. §161.001(b)(1)(E). The relevant inquiry under subsection (E) is whether sufficient evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied).

Scienter is not required for a parent's own acts to constitute endangerment under subsection (E). *See In re L.S.*, No. 10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.—Waco Aug. 24, 2022, no pet.) (mem. op.). It is

also not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* Furthermore, we may consider conduct both before and after the child's removal in an analysis under subsection (E). *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). If the endangering person is someone other than the appealing parent, then the parent generally must have known of the other person's endangering conduct. *T. D. v. Tex. Dep't of Family & Protective Servs.*, 683 S.W.3d 901, 913 (Tex. App.—Austin 2024, no pet.).

The evidence here shows many circumstances relevant under Paragraph (D) and (E). Because the evidence is interrelated concerning these two statutory grounds for termination, we consolidate our examination of the evidence as to both grounds. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied).

Mother argues that the endangering conditions were not created by her, specifically in relation to the incidents of domestic violence in Kansas between her and Father and to the incidents of noise complaints, fighting, and police calls at her brother's apartment in Waco. With regard to the domestic violence, Mother argues that Father was the aggressor, and Mother left Kansas with

K.K. to remove her from the situation. With regard to the incidents at her brother's apartment, Mother contends that the conditions were created by her brother and his roommates and that Mother "extricated herself from that environment as soon as she had alternatives."

Mother also argues that her own conduct was not properly weighed. Specifically, she focuses her argument on the steps she took to address her substance-abuse issues.

Mother and K.K. arrived in Waco in December 2024. Mother provided multiple reasons for the move, including escaping Father's violence, because of Mother and Father's drinking, and that Mother did not like the people Father was associating with. Mother and K.K. stayed at her brother's apartment when they first arrived. On the same day they arrived, an incident occurred at the apartment involving residents being drunk, aggressive, and arguing, which led to multiple residents calling police. The responding officer testified that one of the callers said Mother was "belligerently screaming and acting aggressively" towards other people in the apartment, and that Mother called stating that her sister's boyfriend was acting violent towards her sister. When the responding officer arrived, she made contact with Mother in the apartment parking lot and tried to work with Mother to develop a plan for a shelter or some other location to take K.K. while she sobered up, but Mother wanted to

walk to a hotel with K.K. despite it being a cold night and Mother and K.K. not being dressed for cold weather. Mother was showing signs of significant intoxication. The responding officer noted that when she entered the apartment, K.K. was initially on a bed with an intoxicated adult male and seemed disconnected from the scene despite it being chaotic, but that K.K. ran to Mother's sister in the apartment for comfort instead of to Mother when she heard Mother yelling. Because of Mother's behavior, the responding officer decided to arrest Mother for public intoxication. The responding officer stated that Mother's sister admitted to drinking but was not showing signs of intoxication, so K.K. was left in her care. The responding officer called the Department and turned the case over to them at this point.

Christopher Monteith, a Department investigator, testified about his involvement with the case. He stated that he went to the apartment the day after Mother was arrested for public intoxication. Mother stated they arrived in Texas the day prior because of domestic violence and drug concerns with Father. Mother admitted to a history of drug use, including methamphetamine, marijuana, and heroin. She also admitted that she had drank an entire bottle of vodka the night before, when she was arrested for public intoxication. She admitted to having a problem with alcohol and stated she wanted to seek help but did not have a plan for treatment. She stated she

had progressed from drinking a beer or two at a time to one or two bottles of vodka a night. She also did not have a plan for other living arrangements, despite the allegations of violence in the apartment they were staying in with her sister and other family friends. Monteith observed that one of the adult male residents in the home was intoxicated and exhibiting aggressive and argumentative behavior while Monteith was in the home. Monteith asked whether physical violence had occurred within the residence, and Mother said everyone had gotten aggressive the night before but denied domestic violence had occurred. Mother also disclosed a history of mental health issues, including anxiety, depression, and self-harm. After trying to make a safety plan and discuss alternative arrangements, the decision was made to remove K.K. from Mother's care. Monteith was not able to make contact with Father, which he later learned was because Father was in jail in Kansas.

Rebecca Mitschke, the Department caseworker assigned to this case, testified about Mother's actions during the pendency of the case. Mitschke stated the Department's initial concerns were alcohol abuse, stability, the ability to supply basic needs to the child, and a history of domestic violence and possible mental health issues. In collaboration with Mother, the Department developed a family service plan, which was adopted as a court order, to help address these issues. The Department added inpatient drug and alcohol

treatment services to the service plan after Mother tested positive for alcohol and admitted to alcohol consumption. Mitschke discussed several different rehabilitation facilities with Mother and advised Mother that she was going to have to make contact with the facilities to admit herself. Mother was admitted into an inpatient alcohol treatment facility, but the facility sent her to a different facility to address some mental health concerns.

After Mother completed the mental health treatment, the alcohol treatment facility was unable to take her back immediately. Mitschke testified that she continued to work with Mother to get her into an inpatient program, and at the end of February 2025, Mother told Mitschke that she was able to get a new start date in early March for inpatient alcohol treatment. Mitschke contacted Mother on March 3, 2025 to see if she had made it safely to the rehabilitation facility, but Mother did not respond for over a month. When Mitschke next heard from Mother, Mother informed Mitschke that she had not gone to inpatient treatment and instead had moved to Colorado. Mother did not provide any plan for seeking inpatient treatment in Colorado. A couple weeks later, Mother informed Mitschke that she had been arrested in Colorado for assault and damage to property after an argument with a boyfriend. Mother stated that "the relationship had become violent and that she felt it had to do with alcohol." Mitschke discussed the possible limitations on

Department assistance caused by Mother's move out-of-state. Mother said she planned to stay in Colorado because she had family and friends to stay with there and that she was going to look for alcohol treatment resources there, which Mitschke assisted her with as she was able.

From March 2025 to May 2025, Mitschke testified that Mother had not had any visitation with K.K. The Department recommended that her visits be suspended until her alcohol issues could be addressed, and the court ordered that she needed to complete a 30-day inpatient program before she could resume virtual visits with K.K. Mother completed a 28-day inpatient program and was able to resume virtual visits with K.K. in June 2025. Mother lived in a sober living house for a month after completing inpatient and maintained a job at a clothing store, but when she was able to graduate to a sober living apartment, she did not do so. Instead, she decided to move in with a new boyfriend and quit the job at the clothing store because it was too far away from her new living arrangement. Mother did not report any sort of continuing services to help her maintain her sobriety. In early August 2025, Mother admitted she had drank again, but that she was going to Alcoholics Anonymous and trying to get medication to help her with her cravings. At the end of August, Mother told Mitschke that she could not live with her boyfriend anymore because of domestic violence and that "they brought out the worst in

each other." Mother stated she was going to go to a sober living for mothers with children, but Mitschke testified that Mother never went to the sober living.

Mitschke testified that in early September 2025, Mother again admitted to drinking and that her next test would show that she drank. She also reported that she had moved in with her grandfather and cousin, who were renting the upstairs portion of another man's house. The Department had concerns about this living arrangement because the cousin had some mental health issues and the man who owned the house had an alcohol problem. In November 2025, Mother texted Mitschke and admitted to smoking marijuana. The Department also received multiple diluted and positive tests that showed Mother had been drinking again. When Mitschke asked her about the tests, Mother stated she stopped taking the medication that helped with her cravings in December because of the holidays. In January 2026, Mitschke and Mother discussed Mother's plans going forward. Mother stated she was considering changing her job again and had talked with a friend about moving to Wyoming because the cost of living was lower. As of two days before the final hearing, Mother had again moved and was living with her sister in Denver. Mother had quit her job and was trying to get another job.

In Mother's own testimony, she admitted that she had had monthly relapses after leaving the sober living house and that the only period of time that she maintained sobriety during the pendency of the case was while she was in the rehabilitation facility and the sober living house. She also testified that she had moved nine or ten times in the year that the case had been pending.

As stated above, the Department's initial concerns included alcohol abuse, stability, and the ability to supply basic needs to the child. Based on the testimony from multiple witnesses, as well as Mother's own admissions, these concerns remained throughout the pendency of the case and were still concerns at the final hearing. Considering all the evidence presented in this case in the light most favorable to the trial court's finding and considering the evidence as a whole, we conclude that the evidence was legally and factually sufficient to support termination of Father's parental rights under Paragraphs (D) and (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1).

Therefore, we overrule Mother's third issue.

2. Subsection 161.001(b)(2): Best Interest

In her first issue, Mother argues that the evidence is insufficient to support the trial court's finding that termination of Mother's parental rights was in the best interest of K.K. under Section 161.001(b)(2). Specifically, she

argues that "the Department refused to honor an approved kinship placement that would have provided K.K. permanency without termination." The kinship placement Mother argues for would have K.K. living with Father's aunt, Holly Stanton, in Tennessee, with Stanton's husband and teenage or adult children.

In determining the best interest of a child, several factors have been consistently considered, which were set out in the Supreme Court of Texas's opinion of *Holley v. Adams*. 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id*. This list is not exhaustive but simply identifies factors that have been or could be pertinent in the best-interest determination. *Id.* at 372. There is no requirement that all these factors be proven as a condition precedent to parental termination. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the child's best

interest. *Id.* In fact, while no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). And evidence relating to the predicate grounds under subsection 161.001(b)(1) may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 28.

Regarding the emotional and physical needs of the child now and in the future, the need for permanence is the paramount consideration. *In re A.R.C.*, 551 S.W.3d 221, 227 (Tex. App.—El Paso 2018, no pet.); *Dupree*, 907 S.W.2d at 87. As previously discussed, Mother had moved nine or ten times in the year this case was pending. Her plan going forward was that K.K. could live with Stanton in Tennessee while Mother continued to live in Colorado or elsewhere. Because she had moved to Colorado, Mother also had not been able to visit with K.K. in person for a significant portion of the pendency of the case, and her virtual visits had been brief. Mother did not express any plans to move closer to Stanton if K.K. were to be placed there.

Regarding the emotional and physical danger to the child now and in the future, evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."). Mother argues that the Department offered no evidence that Stanton's household would expose K.K. to any future danger. However, whether the Department had considered potential placement with a paternal relative does not bear on whether termination is in the child's best interest. *In re K.P.C.*, No. 14-17-00993-CV, 2018 WL 2106669, at *12 (Tex. App.—Houston [14th Dist.] May 8, 2018, pet. denied) (mem. op.). K.K. was removed from Mother's care due to concerns of alcohol abuse, lack of stability, and inability to provide for K.K.'s basic needs. In our analysis of the sufficiency of the evidence to support termination pursuant to subsections 161.001(b)(1)(D) and (E), we have detailed Mother's misconduct both leading up to the Department's involvement and during the pendency of this case. The record shows that the Department's concerns at the outset of the case remained throughout the case and were still present at the time of the final hearing. While Mother did go to inpatient rehabilitation for her alcohol use and stay in sober living for a period of time, Mother continued to drink and testified that she relapsed at least monthly between her time in

sober living and the final hearing. Mother testified that she chose to stop medication that was helping with her cravings so that she could drink around the holidays. She also continued to change her living arrangements constantly, choosing to live in residences with alcohol, violence, and other issues that she admitted would not be safe or healthy for K.K.

Regarding the plans for the child by the individuals or agency seeking custody and the stability of the home or proposed placement, the factfinder may compare the parent's and the Department's plans for the child and consider "whether the plans and expectations of each party are realistic or weak and ill-defined." *In re J.D.*, 436 S.W.3d 105, 119–20 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A parent's failure to show that he or she is stable enough to parent a child for any prolonged period entitles the factfinder "to determine that [the] pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the child may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. *In re B.H.R.*, 535 S.W.3d 114, 124 (Tex. App.—Texarkana 2017, no pet.).

The goal of establishing a stable, permanent home for a child is a compelling state interest. *Dupree*, 907 S.W.2d at 87. On appeal, Mother argues that termination is not in K.K.'s best interest based on placement in a non-relative foster home when placement with Holly Stanton, Father's aunt, may be possible. While a child's anticipated placement is a factor in determining the child's best interest, the fact that placement will be with non-relatives is not a bar to termination. *See In re A.L.*, 389 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2012, no pet.). At trial, Mother did not provide any plan going forward for K.K. other than testifying she would be able to care for K.K. if she was returned to Mother. The Department, on the other hand, provided clear plans for K.K.'s future care and stability. The record shows that K.K. was doing well in the foster placement; her needs were being met and she had bonded with the foster family. The foster parents were also interested in adopting K.K. if Mother and Father's parental rights were terminated.

Based on the foregoing evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to K.K. was in the child's best interest.

Accordingly, Mother's first issue is overruled.

3. Subsection 161.001(f): Reasonable Efforts to Return

In her second issue, Mother argues that the evidence is insufficient to support the trial court's reasonable-efforts finding under Section 161.001(f) "where the Department treats relative-placement attempts as evidence of reasonable efforts and the Department here failed to follow through on an approved relative placement."

Texas Family Code requires the trial court to make a finding that the Department made reasonable efforts to return the child to the parent:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
>> (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent

TEX. FAM. CODE ANN. §161.001(f)

The standards of review for legal and factual sufficiency of the evidence supporting the trial court's finding pursuant to subsection 161.001(f) are the same as the standards for the predicate grounds. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency).

Mother argues that "if attempting relative placement is evidence of reasonable efforts, then unjustified failure to follow through on an approved relative placement is evidence that those efforts fell short of the statutory standard." However, subsection 161.001(f) requires only that the Department has made reasonable efforts to return K.K. to *Mother* before the trial court can order termination of Mother's parental rights; it does not require that the Department have made reasonable efforts to place K.K. with other family members. *See Rogers v. Dep't of Family & Protective Servs.*, 175 S.W.3d 370, 379 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (no duty to place child with relative before termination of parental rights). As previously stated, the trial court's determination of where a child should be placed is a factor in determining the child's best interest, but the fact that placement will be with non-relatives, rather than with family members, is not a bar to termination. *See In re A.L.*, 389 S.W.3d at 902. While some cases have considered evaluating other family members' homes for potential placement as part of the

Department's reasonable efforts to return the child to the parent, this is not the only evidence the trial court can consider.

The Department's implementation of a family service plan is generally considered a reasonable effort to return the child to the parent. *See, e.g., A.D. v. Tex. Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.); *In re J.S.S.*, 594 S.W.3d 493, 503 (Tex. App.—Waco 2019, pet. denied). Here, the trial court found that the Department's reasonable efforts in this case included: attempting to implement a safety plan and parent-child safety placement prior to K.K.'s removal; holding a family group conference to develop family plans of service for the parent; providing family plans of service to the parents that included services to help alleviate the issues and concerns that gave rise to the Department's involvement; attempting to assist Mother to find a shelter that she and K.K. could remain together prior to K.K.'s removal; holding statutorily-required and informal conferences to assist and encourage Mother in making changes so K.K. could be reunified with her; attempting numerous times to get Mother treatment for alcohol and encouraging her to go into sober living placements to help her with her sobriety; providing transportation to Mother to a rehabilitation facility and to visits with K.K. when Mother was residing in Texas; maintaining contact with Mother and encouraging her engagement in services; offering supervised visits

for Mother to foster a healthy parent-child relationship and making arrangements for Mother to continue visits virtually after Mother relocated out of state; and working with Mother to help her have more meaningful virtual visits by informing her of ideas for conversations and activities for the virtual visits. The evidence previously discussed shows that the Department took many steps during the pendency of the case with the stated goal of returning K.K. to Mother's care, which supports the trial court's findings pursuant to subsection 161.001(f).

Therefore, we overrule Mother's second issue.

## B. Father's Appeal

Father filed a notice of appeal from the trial court's order terminating his parental rights to K.K.[1] Counsel for Father has now filed an *Anders* brief, asserting that they diligently reviewed the record and that, in their opinion, the appeal is frivolous. *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *In re E.L.Y.*, 69 S.W.3d 838, 841 (Tex. App.—Waco 2002, order) (per curiam) (applying *Anders* to termination appeal).

Counsel's brief meets the requirements of *Anders*; it presents a professional evaluation demonstrating why there are no arguable grounds to

---

[1] The trial court found by clear and convincing evidence that Father had violated Family Code subsection 161.001(b)(1)(D), (E), and (N) and that termination was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1).

advance on appeal. *See In re Schulman*, 252 S.W.3d 403, 406 n.9 (Tex. Crim. App. 2008) ("In Texas, an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities."); *Stafford v. State*, 813 S.W.2d 503, 510 n.3 (Tex. Crim. App. 1991). Counsel has carefully discussed why, under controlling authority, there is no reversible error in the trial court's order of termination. Counsel has further informed us that he has served appellant with a copy of his *Anders* brief, informed Father of his right to review the appellate record and to file a pro se response, and provided Father with a form motion for pro se access to the appellate record. *See Anders*, 386 U.S. at 744, 87 S.Ct. at 1400; *Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014) ; *Stafford*, 813 S.W.2d at 510 n.3; *High v. State*, 573 S.W.2d 807, 813 (Tex. Crim. App. [Panel Op.] 1978); *see also Schulman*, 252 S.W.3d at 408–09. By letter, we also informed Father of his right to review the record and to file a *pro se* response. He did not file a *pro se* response.

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the appeal is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80, 109 S.Ct. 346, 349–50, 102 L.Ed.2d 300 (1988). An appeal is "wholly frivolous" or "without merit" when it "lacks any basis in law or fact." *McCoy v. Court of Appeals*, 486 U.S. 429, 438 n.10, 108 S.Ct. 1895,

1902 n.10, 100 L.Ed.2d 440 (1988). We have reviewed the entire record and counsel's brief and have found nothing that would arguably support an appeal.[2] *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005) ("Due to the nature of Anders briefs, by indicating in the opinion that it considered the issues raised in the briefs and reviewed the record for reversible error but found none, the court of appeals met the requirements of Texas Rule of Appellate Procedure 47.1."); *Stafford*, 813 S.W.2d at 509.

## C. Conclusion

In light of the foregoing, we affirm the trial court's order of termination.

---

[2] Counsel reviewed the sufficiency of the evidence supporting the trial court's findings as to Father under Family Code subsections 161.001(b)(1)(D), (E), and (N) and determined that it would be frivolous to attack the findings. We also conclude that the evidence is sufficient to establish that Father violated subsection (D) and (E). *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (holding due process and due course of law requirements mandate appellate court detail its analysis if appellate court affirms termination on either subsection (D) or (E)). As stated above, many factors can support an endangerment finding, including a parent's failure to complete a court-ordered service plan, missed visits with the child, and conduct that generally subjects a child to a life of instability and uncertainty. *In re A.R.M.*, 593 S.W.3d 358, 371-372 (Tex. App.—Dallas 2018, pet. denied). The record here shows that Father engaged in domestic violence, consumed a heavy amount of alcohol that resulted in intoxication, and possibly used drugs all in the presence of K.K. Further, at the time of the final hearing, Father admitted to recent usage of methamphetamine, marijuana, and fentanyl. He was also pending felony charges for distribution of methamphetamine in a school zone. The evidence also indicated that Father failed to attend a number of visits with K.K. and had no visitation for nearly a year before the final hearing. Father also failed to participate in the hair follicle drug testing and failed to have stable housing due to incarceration.

_____

MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED:  August 13, 2026

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
CV06

